UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

OCTAVIO COVARRUBIAS,            )
                                        )
               Plaintiff,          )     Case No. 19-cv-4866
                                        )
         v.                    )     Hon. Steven C. Seeger
                                        )
WENDY'S PROPERTIES, LLC,        )
                                        )
            Defendant.      )
_____)

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Octavio Covarrubias walked into Wendy's late at night, looking for a coffee and a bathroom. The cashiers were closing up shop and shutting down the registers, so he headed straight to the bathroom. Covarrubias, who has lived on the streets, took the opportunity to make use of the facilities. He brushed his teeth and planned to use the urinal.

According to Covarrubias, things quickly went south from there. A Wendy's employee entered the bathroom and told him that it was time to go, but Covarrubias said that he wasn't done yet. The employee left, but returned with another employee a few minutes later. That's when things got physical. The employees grabbed Covarrubias while he was actively using the urinal and shoved him out of the bathroom. The complaint alleges that one of the employees grabbed him in his private area.

Covarrubias later filed suit against Wendy's, seeking to hold the company responsible for the rough-handling by its employees. After discovery, Wendy's moved for summary judgment, arguing that the employees acted outside the scope of employment.

For the reasons stated below, the motion for summary judgment is granted in part and denied in part. The motion is denied, except to the limited extent that the complaint could be

read to allege sexual assault. That conduct, if it occurred, was outside the scope of employment. But a jury needs to decide whether Wendy's is responsible for the rest of the conduct by its employees.

### The Local Rules

Before diving into the record, this Court must call attention to the failure by Wendy's to comply with the Local Rules. Covarrubias – a *pro se* litigant – complied with the Local Rules. But Wendy's did not.

Covarrubias filed a statement of additional facts, as Local Rule 56.1(b)(3) entitled him to do as the non-movant. *See* Pl.'s Statement of Additional Facts (Dckt. No. 161); *see also* L.R. 56.1(b)(3). That filing triggered an obligation by Wendy's to file a response, and it needed to comply with Local Rule 56.1(e). *See* L.R. 56.1(c)(2).

Local Rule 56.1(e) provides that the response "must consist of numbered paragraphs corresponding to the numbered paragraphs" in the statement of facts. *See* L.R. 56.1(e)(1). Importantly, the responding party cannot simply give a response, without more. The responding party must recite the paragraph in question, meaning the fact offered by the other party, and *then* give a response. "Each paragraph shall set forth the text of the asserted fact (including its citations to the supporting evidentiary material), and then shall set forth the response." *Id.*

That requirement exists for good reason. It is hard to make sense of a response if you don't know what the party is responding *to*. And it is cumbersome to have to flip back and forth between two different documents – one by the offering party, and the other by the responding party – to try to piece it all together. The response must contain everything that the Court needs to read in a user-friendly package.

Covarrubias followed the rules, but Wendy's did not. In its response, Wendy's failed to restate the paragraphs from Covarrubias's statement of additional facts. Instead, Wendy's simply gave its responses, without revealing what it was responding to.

For example, the response to paragraph 2 says: "Defendant denies; Moves to strike Paragraph 2 because it is factually incorrect." *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 2 (Dckt. No. 195). There is no way to know what that response means without picking up Covarrubias's statement of additional facts, and comparing the two documents. The response to paragraph 3 says: "Defendant denies," followed by a citation to a declaration. *Id.* at ¶ 3.

And so on. No person who reads those responses would have any earthly idea what is what.

By phoning it in, Wendy's forced the Court to go back and forth, ping-ponging from document to document, to try to figure out what facts are disputed. Viewed in isolation, it might not seem like the crime of the century. And it isn't. But writ large, non-compliance with the Local Rules adds up.

Each district court judge in this district has hundreds of cases and hundreds of motions on his or her plate at any given time. Every time a party forces the Court to do extra work, it slows the Court down. And that delay imposes a cost – a cost paid by everyone else. When a party creates extra work for the Court, parties in other cases have to wait that much longer for a ruling. It slows down the wheels of justice if a party takes the easy way out.

All litigants, including *pro se* litigants, must follow the Rules. All too often, *pro se* litigants are the ones who struggle to follow the rules. But not here. It is not too much to ask Wendy's – a large, multinational corporation – to comply with the Rules while litigating against

a *pro se* plaintiff. So, Defendant's response to the statement of additional facts is hereby stricken for failure to comply with the Local Rules.

To be clear, striking that response does not affect the outcome of this ruling. This Court is not relying on any facts in Plaintiff's statement of additional facts. So, the ruling would be the same, even if the Court accepted the non-compliant response from Wendy's. Striking the response may not have substantive value in this particular case. But it does have value as a reminder to the bar to play by the Rules.

With that wind-up, the Court turns to the facts of the case.

## Background

The parties agree that Plaintiff Octavio Covarrubias entered a Wendy's restaurant in a Chicago suburb, around closing time, on a wintry night in 2018. And they agree that Wendy's forced him to leave a short time later. But they don't agree on much else – especially about what happened in between.

On February 1, 2018, at around 10:00 p.m., Octavio Covarrubias walked into a Wendy's restaurant in Cicero, Illinois. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 1 (Dckt. No. 156). The exact time of his arrival is not entirely clear, and the parties quibble about it. The key point is that the doors were open, and other customers were in the restaurant, but the employees were closing the registers for the day. *Id.*; *see also* Covarrubias Dep., at 76:24 – 77:16, 97:23 – 98:4, 100:3-20 (Dckt. No. 147-2). If Covarrubias wanted a square burger or a Frosty, he was out of luck. *See* Covarrubias Dep., at 77:12-16.

Covarrubias, it seems, was a regular at the restaurant. *See* Pl.'s Interrogatory Resp., at 11 (Dckt. No. 197, at 12 of 18). He "would go there 10 to 15 minutes before 10:00 o'clock to have [his] coffee." *See* Covarrubias Dep., at 77:10-11 (Dckt. No. 147-2).

4

Covarrubias was too late to order food, but he took the opportunity to avail himself of the facilities. He went into the bathroom. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 2 (Dckt. No. 156). He apparently had to go, but instead of heading to a toilet or urinal, he took care of other needs first. He pulled out his toothbrush and brushed his teeth. *Id.* at ¶ 4; Covarrubias Dep., at 99:22 – 100:20 (Dckt. No. 147-2).[1]

After a few minutes, as Covarrubias brushed away, an employee came into the bathroom and told him that they were closing up shop. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 4 (Dckt. No. 156). Covarrubias responded that he needed to finish brushing, and that he needed to use the urinal, too. *See* Covarrubias Dep., at 101:2 – 102:2 (Dckt. No. 147-2). The employee then left without saying a word. *Id.* at 101:19 – 102:9.

Covarrubias finished brushing, and then used the urinal. *Id.* at 104:3 – 105:1. While that process was actively underway, another employee burst into the bathroom, with a second employee behind him. *Id.* at 105:5-7, 106:14-23.

According to Covarrubias, that's when things got physical. And Covarrubias wasn't prepared for a physical encounter. He was in the middle of urinating, with his fly open. *Id.* at 107:6-8. The employee didn't let Covarrubias finish. Instead, he grabbed Covarrubias from behind and pulled him to the door. *Id.* at 77:23 – 78:7, 107:3-9; *see also* Pl.'s Interrogatory Resp., at 11 (Dckt. No. 197, at 12 of 18) (stating that an employee "pulled me towards the door all while my pants were still down").

---

[1] It is possible that Covarrubias was homeless at the time. On the day of his deposition, Covarrubias was living "[o]n the street." *See* Covarrubias Dep., at 8:6-7 (Dckt. No. 147-2). He has a history of living in shelters. *Id.* at 8:8-18. He wasn't sure where he lived on the day of the incident, but he may have lived in an apartment or in a van. *Id.* at 11:11-16. That backstory helps to explain why Covarrubias brushed his teeth after entering the restaurant.

Covarrubias testified that the employee grabbed him near the groin. *See* Covarrubias Dep., at 108:5-15 (Dckt. No. 147-2). He offered the following description of the encounter: "He didn't necessarily grab my penis. Since I was urinating, he grabbed me from behind and he kind of pushed me forward, and then he pushed me toward the door."[2] *Id.* at 78:10-13. He testified that more than one employee pushed him out. *Id.* at 109:24 – 110:10.

At other times, Covarrubias has described the physical contact in even more dramatic terms. The complaint alleges that an employee "grabbed me by my penis." *See* Cplt. (Dckt. No. 1-1, at 4 of 5). Covarrubias gave the same vivid description of the incident in his interrogatory responses: an employee "grabbed me by my penis." *See* Pl.'s Interrogatory Resp., at 11 (Dckt. No. 197, at 12 of 18).

As Covarrubias tells it, the physical contact wasn't the only ugly moment in that episode. Adding insult to injury, the employees laughed and taunted Covarrubias with profanities as they pushed him out. *See* Covarrubias Dep., at 78:21 – 79:5, 110:7-15 (Dckt. No. 147-2). According to him, one of the employees said "fuera frijolero," which means "out beaner." *See* Pl.'s Interrogatory Resp., at 11 (Dckt. No. 197, at 12 of 18); Covarrubias Dep., at 78:17-20.[3]

_____

[2] Covarrubias offered the following gloss on his deposition testimony in response to Defendant's statement of material facts. "When Plaintiff says 'didn't necessarily grab my penis', he is not excluding the event that Williams also touched and grabbed the penis. . . . In any instant of the Deposition, Plaintiff answered 'YES,' Williams did not grab and touch the penis; he did when Plaintiff was urinating, hurting also the penis." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 7 (Dckt. No. 156).

[3] In his complaint, and at deposition, Covarrubias repeatedly drew attention to the race of the Wendy's employees, noting that they were black. *See* Cplt. (Dckt. No. 1-1) (noting that the employees were "non-Mexico [sic], non-Hispanic); Covarrubias Dep., at 22:10 – 23:9, 67:13 – 68:6, 70:14-24, 77:23 – 79:5, 80:1-5, 88:23 – 89:6, 101:22 – 102:1, 105:14 – 106:1, 107:10-14, 109:6 – 110:4, 111:17 – 112:20, 113:4-12, 114:4-9, 115:6-13; *see also See* Pl.'s Statement of Additional Facts, at ¶ 1 (Dckt. No. 161) ("On February 1, 2018, . . . one African American Wendy's crew member assaulted physically and verbally Plaintiff with discriminatory racial and ethnic insults."); *id.* at ¶ 2 ("On February 1, 2018, . . . all the crew members and employees in the restaurant are defined as African Americans."); *id.* at ¶ 3 ("On February 1, 2018, . . . all the involved crew members and not workers in the restaurant who assaulted Plaintiff are defined as African Americans."); *id.* at ¶ 4 ("Plaintiff respects all the African American individuals."). The complaint alleges an ethnic slur ("fuera frijolero"), but there is no claim about mistreatment on the basis of his race or ethnicity.

Wendy's, for its part, denies that any physical contact took place. The company offered a declaration from Chenault Williams, the employee who escorted Covarrubias out the door that night. According to Williams, he never laid a finger on Covarrubias, let alone roughed him up. *See* Williams Dec. (Dckt. No. 147-4).[4]

After getting manhandled and yanked from the bathroom, Covarrubias went to the registers and said that he wanted to talk with a manager. *See* Covarrubias Dep., at 111:12-16 (Dckt. No. 147-2). Covarrubias then told the manager what had happened, but the manager responded that she didn't believe it. *Id.* at 111:17 – 112:21. The manager gave Covarrubias her phone number, and told him to come back the next day to make a complaint. *Id.* at 113:13-19.

Covarrubias then left, but his ordeal wasn't quite over. He testified: "And, after, one of the black guys told me, like, 'I'm gonna f*ck you.' Not once. He told me a very few times." *Id.* at 113:6-8. Covarrubias made it to the train, and left. *Id.* at 113:8-12.

Covarrubias returned to the restaurant the next day, or maybe a few days later,[5] and voiced his concerns to the manager. *Id.* at 113:20 – 115:24. He came back again and spoke with the general manager, too, sharing his experience. *Id.* at 116:1 – 117:12. Covarrubias asked for an apology, but received none. *Id.* at 117:14 – 118:10.

---

[4] There might be more to Defendant's side of the story. According to Williams, he entered the bathroom and spotted Covarrubias shaving, without a shirt. *See* IDHR Investigation Report, at 6 (Dckt. No. 89-8). When Williams told him that it was time to leave, and picked up his bag, Covarrubias snatched the bag out of his hand and left the restroom. *Id.* That Report isn't in the summary judgment record – it was attached to another motion on the docket, which the Court found – and the written report that Williams gave to the IDHR isn't in the record, either. And it might not have been sworn, so the statement might not count as evidence. And it wouldn't matter at summary judgment anyway, because there is an obvious issue of fact about what happened in the bathroom. The record on the Wendy's side of the ledger is thin, probably because it wouldn't matter anyway given the existence of a genuine fact issue. Still, the Court flags the point simply to preview what the evidence might look like at trial.

[5] Covarrubias apparently told the Illinois Department of Human Rights that he returned to the restaurant on February 6, not February 2. *See* IDHR Investigation Report, at 5 (Dckt. No. 89-8). But for present purposes, the exact date does not matter.

A few weeks later, Covarrubias filed a complaint with the Illinois Department of Human Rights, alleging that Wendy's had denied him equal treatment on the basis of his national origin and ancestry. *See* IDHR Investigation Report (Dckt. No. 89-8). The IDHR investigated and ultimately found a lack of substantial evidence. *Id.*

Covarrubias then filed a *pro se* complaint in state court, alleging assault and battery. *See* Cplt. (Dckt. No. 1-1). He alleges that he "was assault[ed] including battery, and has sustained damages," and "asks for judgment against Wendy's Restaurant." *Id.* at 5; *see also id.* at 4 (alleging "approximately six (6) employees of Wendy's Restaurant at this time, unlawfully assaulted and battery [sic] on February 1[,] 2018"). The Court interprets the complaint broadly to contain two claims: (1) a battery claim for the physical grabbing and pushing, and (2) a sexual assault claim for the touching of Covarrubias's penis.

Wendy's removed the case to federal court. *See* Notice of Removal (Dckt. No. 1). This Court later confirmed the existence of diversity jurisdiction. *See* 7/24/19 Order (Dckt. No. 9).

Discovery followed. One of the main issues during discovery involved the failure by Wendy's to preserve video footage from inside the restaurant during the night in question. The restaurant did not have a camera inside the bathroom, and understandably so. But it did have cameras in the hallways, including the hallway outside the bathroom. So, potentially, the cameras could have captured the interactions and body language of Covarrubias and the employees right after the incident.

The failure by Wendy's to preserve the footage led to a motion for sanctions. *See* Pl.'s Mtn. for Order to Show Cause (Dckt. No. 98); Pl.'s Resp. to Def.'s Mem. to Show Cause (Dckt. No. 103). The presiding Magistrate Judge later issued a Report and Recommendation, concluding that Wendy's should have preserved the video evidence and that Covarrubias

suffered prejudice as a result. *See* 6/21/21 Report and Recommendation (Dckt. No. 107). "[T]he Court has no problem concluding that Plaintiff has been prejudiced to some extent in his ability to develop and present his case because the videos were not preserved." *Id.* at 5. That's an issue for another day (*i.e.*, trial).

Wendy's now moves for summary judgment. *See* Mtn. for Summ. J. (Dckt. No. 146). The basic issue is whether the employees acted with the scope of employment.

### Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in

favor of the non-movant.  *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

Covarrubias brings assault and battery claims against Wendy's for the conduct of its employees.  *See* Cplt., at 2 (Dckt. No. 1-1).  Without expressly saying so, he seeks to hold Wendy's vicariously liable for the actions of its employees under *respondeat superior*.

Wendy's makes only one argument in its motion for summary judgment.  Wendy's argues that the employees acted outside the scope of employment, so the company itself has no liability.  *See* Def.'s Mem. in Support of Summ. J., at 2–5 (Dckt. No. 147); *see also id.* at 3 ("Wendy's denies that any of its employees grabbed plaintiff, used force against plaintiff, or taunted plaintiff; however, this is not the issue at hand because plaintiff's allegations are treated as true.").  In its view, pushing and shoving isn't part of the job at Wendy's, so the company is off the hook.

"Under the theory of *respondeat superior*, an employer can be liable for the torts of an employee, but only for those torts that are committed within the scope of the employment." *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 308 Ill. Dec. 782, 862 N.E.2d 985, 991 (2007); Restatement (Second) of Agency § 219(1) (1958) ("A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.").  "[T]he ultimate question is whether or not the loss resulting from the employee's acts should justly be considered as one of the normal risks to be borne by the employer."  *See Bagent*, 862 N.E.2d at 993.

The scope of employment covers a potentially wide sphere of conduct.  "Under *respondeat superior*, an employer's vicarious liability extends to the negligent, willful, malicious or even criminal acts of its employees, when those acts are committed within the scope of

10

employment." *Adames v. Sheahan*, 233 Ill. 2d 276, 330 Ill. Dec. 720, 909 N.E.2d 742, 754 (2009); *see also Wright v. City of Danville*, 174 Ill. 2d 391, 221 Ill. Dec. 203, 675 N.E.2d 110, 118 (1996) ("[E]ven the criminal acts of an employee may fall within the scope of employment . . . .").

But *respondeat superior* does not apply when the servant is serving *himself*, not the master. "In the context of *respondeat superior* liability, the term 'scope of employment' excludes conduct by an employee that is solely for the benefit of the employee." *See Dennis v. Pace Suburban Bus Serv.*, 2014 IL App (1st) 132397, 385 Ill. Dec. 527, 19 N.E.3d 85, 90 (2014) (citation omitted); *Wright*, 675 N.E.2d at 118 ("[I]f the employee's actions are different from the type of acts he is authorized to perform or were performed purely in his own interest, he has departed from the scope of employment."). And "an employer is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of an authorized result." *Wright*, 675 N.E.2d at 118. An employer is not responsible if the employee goes rogue.

Illinois courts follow the Second Restatement of Agency when defining the scope of employment. *See Adames*, 909 N.E.2d at 755; *Copeland v. County of Macon*, 403 F.3d 929, 932 (7th Cir. 2005) ("To ascertain when an employee's conduct is within the scope of employment, the Illinois Supreme Court has adopted § 228 of the Restatement (Second) of Agency.") (citation omitted). The Second Restatement defined the boundaries of the "scope of employment" with the following guideposts:

> (1)    Conduct of a servant is within the scope of employment if, but only if:
>
>     (a)    it is of the kind he is employed to perform;
>
>     (b)    it occurs substantially within the authorized time and space limits;

(c)      it is actuated, at least in part, by a purpose to serve the master, and

(d)      if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.[6]

*See* Restatement (Second) of Agency § 228(1) (1958); *see also Bagent*, 862 N.E.2d at 992; *Adames*, 909 N.E.2d at 755. The conduct must satisfy all of the requirements to fall within the scope of employment. *See Bagent*, 862 N.E.2d at 992.

"Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *See* Restatement (Second) of Agency § 228(2) (1958); *see also Duffy v.*

---

[6] The Second Restatement has four elements for the scope of employment, and the fourth element applies to claims about the use of intentional force. But the Supreme Court of Illinois has not expressly adopted the fourth element. *See Fuery v. City of Chicago*, 2014 WL 1228718, at *6 n.12 (N.D. Ill. 2014) ("The Illinois Supreme Court has not adopted the fourth factor listed in Section 228 of the Restatement (Second) of Agency for determining the scope of employment issue; that is, "if force is intentionally used by the servant against another, [whether] the use of force is not unexpectable by the master."). In *Bagent*, the Illinois Supreme Court cited the Second Restatement, and then referred to the "three criteria" for conduct that is within the scope of employment, even though the Second Restatement has four criteria. *See Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 308 Ill. Dec. 782, 862 N.E.2d 985, 992 (2007). "These *three* criteria are generally recognized . . . and Illinois courts look thereto for guidance. . . . Subsequent sections elaborate these *three* criteria. . . . [S]cholars have described the *three* section 228 criteria as requirements, all of which must be met to conclude that an employee was acting within the scope of employment. We hold that all *three* criteria of section 228 of the Second Restatement of Agency must be met to conclude that an employee was acting within the scope of employment." *Id.* (emphasis added). Instead of quoting the fourth requirement, the Illinois Supreme Court took it out and inserted an ellipsis. *Id.*; *see also Adames v. Sheahan*, 233 Ill. 2d 276, 330 Ill. Dec. 720, 909 N.E.2d 742, 755 (2009) (same, and inserting a period after the third requirement). But then again, maybe the Illinois Supreme Court was not signaling a rejection of the fourth requirement. The fourth requirement addresses intentional force, and the facts in *Bagent* did not involve that scenario (it involved the wrongful disclosure of medical information). So, maybe the Illinois Supreme Court did not adopt the fourth requirement simply because it didn't apply to that particular case. A few intermediate Illinois appellate courts have mentioned the fourth prong in passing, without applying it. *See, e.g., Boyer as Next Friend of Eskra v. Adono*, 2020 IL App (3d) 180685, 441 Ill. Dec. 259, 156 N.E.3d 594, 604 n.4 (2020) ("Section 228 of the Restatement lists an additional fourth criterion that is not applicable here."); *Gaffney v. City of Chicago*, 302 Ill. App. 3d 41, 236 Ill. Dec. 40, 706 N.E.2d 914, 920 n.6 (1998) ("The omitted subsection deals with the intentional use of force by the servant, which is not relevant to this case."); *Maras v. Mileston, Inc.*, 348 Ill. App. 3d 1004, 284 Ill. Dec. 259, 809 N.E.2d 825, 828–29 (2004) (citing Section 228(1)(d)). The Illinois Supreme Court did not adopt the fourth requirement, but it did not expressly repudiate it, either. In any event, it does not matter here, because there is enough evidence to support the fourth element (assuming that it applies at all).

12

*United States*, 966 F.2d 307, 314 (7th Cir. 1992). Acts that carry out the purposes of the employer can fall within the scope of employment, even if the employee used excessive or improper means. *See* W. Keeton, Prosser & Keeton on Torts § 70, at 502 (5th ed. 1984) ("It [the 'scope of employment'] refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment."). The burden rests on the plaintiff to show that the employee's conduct fell within the scope of employment. *See Bagent*, 862 N.E.2d at 992.

Wendy's argues that the company itself has no liability – even if the story told by Covarrubias is true – because the conduct in question fell outside the scope of employment. Wendy's points out that it has a policy against employees using physical force against customers. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 13, 15–16 (Dckt. No. 156). Managers cannot authorize physical contact, either. *Id.* at ¶ 14. Wendy's employees can show customers the door, but cannot shove customers *out* the door.

The record includes a copy of the Wendy's corporate policy about security, and it gives instructions about how to handle loitering customers who overstay their welcome. The policy suggests that employees act in a "polite and firm" manner. *See* Wendy's Security Reference Guide, at 9 (Dckt. No. 147-8). If that effort fails, and an employee needs to up the ante, the employee should not escalate the situation with physical contact. "If a loiterer refuses to leave, call the police." *Id.* The police can use force, but employees cannot.

Again and again, Wendy's points out that the company did not authorize physical contact with customers. *See* Def.'s Statement of Facts, at ¶¶ 11, 12, 13, 14, 15, 16, 17 (Dckt. No. 148); Slatcoff Dec., at ¶ 6 (Dckt. No. 147-8) ("On February 1, 2018, Wendy's written policies and

13

procedures did not authorize any crew members to use physical force on or with any customer or any other individual in the restaurant."); Williams Dec. (Dckt. No. 147-4). Wendy's hires cooks, cashiers, and cleaners, but not bouncers.

Wendy's seems to think that if it did not authorize physical contact with loitering patrons, then it is off the hook. Not so. "An act, although forbidden, or done in a forbidden manner, may be within the scope of employment." *See* Restatement (Second) of Agency § 230 (1958); *see also* Restatement (Second) of Agency § 230 cmt. b (1958) ("A master cannot direct a servant to accomplish a result and anticipate that he will always use the means which he directs or will refrain from acts which it is natural to expect that servants may do.").

The Second Restatement offered a simple illustration: "P directs his salesman, in selling guns, never to insert a cartridge while exhibiting a gun. A, a salesman, does so. This act is within the scope of employment." *See* Restatement (Second) of Agency § 230 cmt. b, illus. 1 (1958); *see also* Prosser & Keeton, *supra*, § 70, at 502 ("It [the 'scope of employment'] is obviously no more than a bare formula to cover the unordered and *unauthorized* acts of the servant for which it is found to be expedient to charge the master with liability, as well as to exclude other acts for which it is not.") (emphasis added).

"A master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, *although the act was unauthorized*, if the act was not unexpectable in view of the duties of the servant." *See* Restatement (Second) of Agency § 245 (1958) (emphasis added); Prosser & Keeton, *supra*, at § 70 at 502 ("The fact that the servant's act is expressly forbidden by the master, or is done in a manner which he has prohibited, is to be considered in determining what the servant has been

14

hired to do, but it is usually not conclusive, and does not in itself prevent the act from being within the scope of employment.") (citation omitted).

Illinois law and the Second Restatement are on all fours. "Of course, an act of an employee, although forbidden, may be within the scope of employment." *Bagent*, 862 N.E.2d at 994. "An employer is not relieved from liability because an employee does a forbidden act while engaged in the business of the employer." *Pyne v. Witmer*, 159 Ill. App. 3d 254, 111 Ill. Dec. 451, 512 N.E.2d 993, 999 (1987); *see also Maras v. Milestone, Inc.*, 348 Ill. App. 3d 1004, 284 Ill. Dec. 259, 809 N.E.2d 825, 828 (2004) ("A tort can fall within the scope of a person's employment even if the conduct was unauthorized or forbidden by the employer."). Instead, "[a]n employer's liability for an intentional tort will also depend in part on whether the act was a predictable outgrowth of acts the employer authorized the employee to perform." *Maras*, 809 N.E.2d at 828.

In *Maras*, for example, an Illinois appellate court held that "one can reasonably infer that the care of disabled children may properly involve a level of physical constraint." *Id.* at 829. So "escalation of proper constraint to battery at the hands of a tired or frustrated caregiver is, sadly, predictable." *Id.* As a result, the company's policy against hitting children did not shield it from its caregiver's alleged battery.

The fact that an employee violated company policy, without more, is not a get-out-of-liability-free card for the employer. After all, committing torts is typically against company policy. One would hope that torts are unauthorized. *See* Prosser & Keeton, *supra*, § 70, at 502 ("A master cannot escape liability merely by ordering his servant to act carefully."). Otherwise, companies could have a policy against committing torts, and wash their hands of liability for any mayhem that ensues.

15

Intentional torts can fall within the scope of employment, too. And in particular, physical force by an employee can fall within the scope of employment, even if the employer banned the use of force. "It may be said, in general, that the master is held liable for any intentional tort committed by the servant where its purpose, however misguided, is wholly or in part to further the master's business." *See* Prosser & Keeton, *supra*, § 70, at 505; *see also* Restatement (Second) of Agency § 231 (1958) ("An act may be within the scope of employment although consciously criminal or tortious.").

In fact, one of the examples offered by Prosser & Keeton involved an assault while ejecting a trespasser. The employer "will be held liable where his bus driver . . . assaults a trespasser to eject him from the bus . . . ." *See* Prosser & Keeton, *supra*, § 70, at 505.

The Second Restatement adopted the same approach. "[T]he employment of servants to guard or to recapture property . . . is likely to lead to altercations, and the master may become liable, in spite of instructions that no force shall be exerted against the person of the possessor." *See* Restatement (Second) of Agency § 245 cmt. c (1958). The Second Restatement offered an illustration about shoving a trespasser. "P authorizes A, his gardener, to eject trespassers from the land. A ejects T, a trespasser, and in pursuing T across the border gives him an unnecessary shove while both are outside the land. P may be found to be liable for this act." *Id.* at cmt. d, illus. 4.

It is an "important legal principle" – even if it is "not intuitive" – that "an employee can misuse or exceed his authority while still acting within the scope of his employment." *See Javier v. City of Milwaukee*, 670 F.3d 823, 830 (7th Cir. 2012). "[T]he scope-of-employment concept recognizes that an [employee] can exceed or abuse his authority – even intentionally or criminally – and still be acting within the scope of his employment." *Id.* at 832.

16

Here, there is a question of fact about whether the employees acted within the scope of employment. Part of the job of a Wendy's employee is dealing with loitering customers who refuse to leave. That's why the policy has a section entitled "Vagrants and Loiterers." *See* Wendy's Security Reference Guide, at 9 (Dckt. No. 147-8). Getting people to leave is part of the job.

A jury should decide whether the employees took things too far. That is, the question is whether they acted so far outside their job description that their conduct left the scope of employment. The trier of fact should decide whether physical contact was a "predictable outgrowth of acts the employer authorized the employee to perform." *See Maras*, 809 N.E.2d at 828.

The fact that company policy prohibited the conduct does not mean that the conduct was unforeseeable or unexpectable. In fact, the opposite might be true. The fact that Wendy's had a policy about the right way (and wrong way) to deal with loiterers suggests that the use of force was within the realm of imagination. *See Gaffney v. City of Chicago*, 302 Ill. App. 3d 41, 236 Ill. Dec. 40, 706 N.E.2d 914, 923 (1998) ("Indeed, rather than militating *against* a finding that an act was within the scope of employment, *Martin* held that an employer's rule prohibiting certain actions 'only reinforces the conclusion that [such] actions were expected and foreseeable.'") (citation omitted, emphasis in original). Rules ban the foreseeable.

Wendy's then argues that the use of force did not serve the interests of the company, echoing the third requirement under the Second Restatement. *See* Restatement (Second) of Agency § 228 (1958) (requiring a showing that the conduct was "actuated, at least in part, by a purpose to serve the master"). "An act of a servant is not within the scope of employment if it is

17

done with no intention to perform it as a part of or incident to a service on account of which he is employed." *See* Restatement (Second) of Agency § 235 (1958).

The question is whether the conduct was motivated, at least in part, by an interest to serve the employer. "Even if the employee is acting out of malice, ill will, or self-interest, his conduct may still fall within the scope of employment so long as it is motivated, at least in part, by a purpose to serve the master." *See Copeland*, 403 F.3d at 934; *see also Richards v. U.S. Steel*, 869 F.3d 557, 565 (7th Cir. 2017) ("[A]n employer is not liable for the acts of an employee where the acts complained of were committed solely for the benefit of the employee.").

A reasonable jury could find that the employees acted, at least in part, to pursue the interests of Wendy's, even if they took it too far. It was closing time, and Wendy's needed customers to head out. As the saying goes, they didn't have to go home, but they couldn't stay there.

Wendy's had an interest in closing up shop, and to do that, Wendy's needed customers to exit the restaurant. The overarching objective – having customers leave the store – served the interest of Wendy's to close for the night, even if the employees botched the assignment. A reasonable jury could conclude that getting customers out the door at closing time served the interests of the company.

Physically removing a loiterer from a Wendy's might be aggressive conduct, but that doesn't mean it was not for the benefit of Wendy's. "The outrageousness of an act may be evidence that the employee has gone beyond the scope of his or her employment, but it is not conclusive." *Maras*, 809 N.E.2d at 828.

An employee's aggressive tactics to remove unwelcome guests might benefit the employer. "For example, a dramshop keeper may be liable under *respondeat superior* for

18

a bouncer's use of excessive force against a patron even if the keeper did not authorize

the bouncer to use such force." *See Gaines v. Chicago Bd. of Educ.*, 2020 WL 1182767, at *5

(N.D. Ill. 2020). "Whether an employee has departed from the scope of employment by acting

purely for his own interest, rather than at least in part for the employer, is normally a question for

the jury." *Sunseri v. Puccia*, 87 Ill. App. 3d 488, 52 Ill. Dec. 716, 422 N.E.2d 925, 930 (1981).

At closing time, a fast-food employee who enforces the store's rules is not so different

than a security guard. Both tell people where they can be, and where they must go. And when

security guards get into physical confrontations, the jury typically decides whether they went too

far and left the scope of employment. *See, e.g.*, *Jones v. Patrick & Assoc. Detective Agency,*

*Inc.*, 442 F.3d 533, 536 (7th Cir. 2006) ("But physical confrontations are part of a security

guard's job, and it's not really surprising that once in a while one of them will go too far. . . . To

be sure, the attacks in this case push the boundaries of what could be expected from a security

guard, and they may in fact be outrageous enough to fall outside the scope of Pratt's

employment. But we think this is a question for a jury, not a judge on summary judgment, to

resolve."); *Pantoja v. Village of Hoffman Estates*, 2005 WL 372193, at *9 (N.D. Ill. 2005) ("The

officers were performing security services at PCSC and specifically attempting to assist Crowe

in closing the bar when they beat Pantoja. . . . The officers' intentional use of force may have

been excessive, but the court cannot say that it was 'unexpectable' as a matter of law. To the

contrary, it is reasonably foreseeable that security guards may need to use some amount of force

to perform their job, and that circumstances may escalate to the level alleged in this case.").

That said, some of the alleged conduct was beyond the pale. In fact, it was so far beyond

the pale that it left the scope of employment. Covarrubias alleged in his complaint that the

employee grabbed his penis, and there is some supporting evidence in the record (*i.e.*, his

interrogatory responses).  That conduct is so outrageous and unforeseeable that no reasonable person could attribute it to the company.  *See* Restatement (Second) of Agency § 231 cmt. a (1958) ("[T]he master is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result.").

The allegation, in essence, is sexual assault.  No reasonable jury could find that sexual assault was part of the job.  "Sexual harassment and assault are not within the scope of employment."  *Aleman v. McDonald's Corp.*, 2021 WL 34118857, at *6 (N.D. Ill. 2021). Illinois courts hold that "in the specific context of sexual assault, the sexual nature of the misconduct generally disqualifies the employee's act as being taken in furtherance of the employer's interest."  *See Richards*, 869 F.3d at 565; *Doe ex rel. Doe v. Lawrence Hall Youth Servs.*, 2012 Ill App (1st) 103758, 358 Ill. Dec. 867, 966 N.E.2d 52, 62 (2012) ("[S]exual assault *by its very nature* precludes a conclusion that it occurred within the employee's scope of employment under the doctrine of *respondeat superior*.") (emphasis added) (collecting cases).

In sum, Defendant's motion for summary judgment is granted in part and denied in part. Covarrubias testified that employees of Wendy's grabbed him and pushed him out of the restaurant.  There is a genuine issue of material fact about whether the employees acted within the scope of employment when (according to Covarrubias) they laid hands on him.  *See* Restatement (Second) of Agency § 228 cmt. d (1958) ("The question whether or not the act done is so different from the act authorized that it is not within the scope of the employment is decided by the court if the answer is clearly indicated; otherwise, it is decided by the jury.").  But the Court grants summary judgment to Wendy's for any claim of sexual assault.

**Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment is granted in part and denied in part.

Date:   April 27, 2022

_____

Steven C. Seeger
United States District Judge